J-A13010-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL BAHNATKA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VICTORY BREWING COMPANY, LLC | : | No. 1095 EDA 2019 |

Appeal from the Order Entered March 18, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
2016-07968-MJ

BEFORE:    BENDER, P.J.E., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED JULY 08, 2020**

Appellant, Michael Bahnatka, appeals from the trial court's March 18, 2019 order granting Appellee's, Victory Brewing Company, LLC ("Victory"), motion for summary judgment.  We affirm.

The trial court summarized the background of this case as follows:

[Victory] moved for summary judgment against [Appellant] on his third amended complaint for wrongful discharge.

When considering a motion for summary judgment, the record is viewed in the light most favorable to the non-moving party. Accordingly, in the light most favorable to [Appellant], the facts are:

_____

[*] Retired Senior Judge assigned to the Superior Court.

1. [Appellant] started working for Victory on July 14, 2014[,] as a part-time Retail Associate.[1]

2. [Appellant] was promoted on November 24, 2014[,] to Inventory/Point of Sale Clerk.

3. David Hindman, an in-house accountant for Victory, instructed [Appellant] to provide him with physical inventory counts, not calculated on-hand inventory counts.[2]

4. Hindman used [Appellant's] monthly counts to calculate the difference between calculated on-hand inventory and actual physical inventory, known as a variance, before making any accounting adjustments.

5. In October 2015, [Appellant] was instructed by his two superiors, Jen Corrigan, vice-president of finance and corporate strategy, and John Dykstra, director of supply chain fulfillment, to submit calculated on-hand inventory counts to Hindman, instead of physical counts.

_____

[1] The parties do not dispute that Appellant was an at-will employee of Victory at all times relevant to this action.

[2] Appellant explains the difference between physical inventory counts and calculated on-hand inventory counts as follows:

> [Victory] required … monthly physical inventory counts to compare those figures to the calculated on-hand inventory figures maintained in its computerized tracking program referred to as "Great Plains." The "Great Plains" program kept track of inventory available and inventory allocated. However, said progeam [*sic*] did not deplete daily sales and, accordingly, the program did not reflect "live" inventory. [Victory] conducted the aforesaid monthly physical inventory counts to compare those figures to the figures in its "Great Plains" database and to determine whether any variance[1] existed.
>
> > [1] A variance could occur for various reasons including, but not limited to, shrink/inventory loss (*i.e.*[,] human error, input errors, theft, property damage, [or] vendor fraud).

Appellant's Brief at 10-11 (internal citations omitted).

6. [Appellant] refused and stated that doing so would constitute falsifying company records and was against the law.

7. [Appellant] contends that the calculated on-hand inventory reflected a materially inflated inventory value, greater than $50,000, as compared to the physical inventory value.

8. [Appellant] contends that the falsification of inventory would increase the perceived value of the company to potential lenders and he therefore refused to comply with his superiors' directive, which ran counter to the directive he had received from Hindman months earlier.

9. [Appellant] contends that the conduct he was asked to engage in constitutes a fraudulent business practice under [18] Pa.C.S.[] § 4107[,] and unlawful tampering with company records under 18 Pa.C.S[] § 4104(a).

10. Shortly after [Appellant] refused to engage in these activities as directed by his superiors, Victory embarked on a campaign of retaliation.

11. [Appellant] was pressured to resign by Corrigan and Dykstra, but resisted.

12. On December 3, 2015, [Appellant] was given a Performance Improvement Plan ("PIP") despite his stellar performance and was demoted.

13. On December 7, 2015, [Appellant] submitted a letter to Betsy Benner, [the] human resources manager[,] in which he stated that he … had been issued the PIP in retaliation for reporting and refusing to engage in illegal activity within the company ("Protected Activity Letter").

More specifically, [Appellant] wrote[:] "I believe that the issuance of the aforementioned PIP is retaliatory in nature and in direct response to my complaints of illegal activity within the company, namely, theft…. In April of 2015, I discovered a substantial amount of merchandise missing. I raised my concern with Jen Corrigan that employees of Victory were engaged in illegal activity, specifically, stealing cash sales, and stated my opposition to the practice. Thereafter, I conducted an investigation on non-company

time, and identified several individuals who were stealing cash sales. In September of 2015, I presented [m]y findings to [management]. Immediately thereafter, Jen began exhibiting hostile conduct toward me, and has continued to do so[.] I believe that Jen's hostility is in direct response to my complaints of illegality within the company."[3]

---

[3] For context, later in the trial court's opinion, it explained that — in addition to Appellant's claim relating to Victory's methods of counting and recording inventory — Appellant had pleaded another claim in his complaint regarding theft, which he subsequently abandoned. Specifically,

[Appellant] contended that he was terminated for "refusing to engage in the illegal activities of [Victory], namely theft of company property [growlers] in violation of 18 [Pa.C.S.] § 3921(a)." (Third Amended Complaint, ¶ 43)[.] In this regard, [Appellant] contends that he was punished for his persistence in uncovering employee theft of growlers and/or cash receipts from the sale of growlers. ([*Id.* at] ¶¶ 13-18, 20-22)[.] In response to Victory's summary judgment motion, [Appellant] does not argue that this claim is viable. Furthermore, [Appellant] admitted in his deposition that he was never asked to cover up the theft of growlers or the theft of cash receipts from the sale of growlers. The summary judgment record demonstrates that Victory actively investigated growler shortages after [Appellant] observed variances in the growler inventory. Victory began conducting daily counts of growler inventory at its three restaurant locations, rather than monthly counts. Victory devoted increased labor resources to this investigation. [Appellant] admitted that his concern about possible retail theft was never disregarded, nor was he ever told not to investigate the matter. Victory provided [Appellant] with access to video surveillance systems in its restaurants and access to employee work schedules. After investigation, there was conclusive evidence that implicated two bartender employees and [Appellant] admits that Victory took action and terminated the two bartenders who had engaged in retail theft. [Appellant] has come forward with no evidence to support a claim that he was ever directed or urged to engage in retail theft or that Victory condoned or ignored retail theft by its employees. The Protected Activity Letter addresses only this theft

14. On December 9, 2015, [Appellant] signed the PIP and added a statement that he found "the issuance of this document unjustified and retaliatory." Nonetheless, [Appellant] immediately began to conform his conduct to the requirements of the PIP.

15. On December 10, 2015, Benner and Amy Brill, also from human resources, met with [Appellant] to discuss the allegations in the Protected Activity Letter. Brill told [Appellant] that his allegations were very serious and he could get in trouble for registering such a complaint. Brill told [Appellant] that Corrigan no longer wished to work with him[,] and she believed other employees would also be uncomfortable working with him.

16. On December 15, 2015, Dykstra canceled the first scheduled catchup meeting, a PIP condition.

17. On or about December 16, 2015, Victory terminated [Appellant's] employment. Brill told [Appellant] that his employment was terminated because [Appellant] had written on the PIP that its issuance was retaliatory.

TCO at 1-3 (internal citation omitted).

In ruling on Victory's summary judgment motion, the trial court recognized that the only remaining claim advanced by Appellant was that "his employment was terminated in retribution for his refusal to commit a criminal act, specifically, falsification of business records[,]" as "he refused to provide Victory's internal accounting manager with a 'calculated on[-]hand' inventory figure, rather than a physical count, for the month ending [on] September 30, 2015." *See* TCO at 3-4. The trial court noted that, according to Appellant, "Victory intended to overstate its inventory on financial statements and loan

---

claim and does not address [Appellant's] claims regarding Victory's methods of counting and recording inventory.
Trial Court Opinion (TCO), 3/18/19, at 3 n.1 (some brackets added).

applications to induce third[-]party investment and financing[,]" and that such conduct constitutes the criminal offenses of fraudulent business practice and tampering with records. *Id.* at 4. Despite Appellant's contentions, after examining the relevant criminal statutes and case law, the trial court granted summary judgment in favor of Victory, determining that Appellant had "failed to demonstrate how the use of a particular accounting method fits into the definition of either the crime of fraudulent business practice or tampering with records." *Id.* at 8.

Appellant subsequently filed a timely notice of appeal, and timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Presently, he raises the following issues for our review:

> 1. Whether the trial court's [o]rder granting summary judgment was issued in error as a result of the court's erroneous finding that there were no genuine issues of material fact as to a necessary element of the cause of action.
>
> 2. Whether the trial court's [o]rder granting summary judgment was issued in error as a result of making an erroneous finding of fact in the light most favorable to [Victory] that "the use of a particular accounting method to record monthly inventory was not a crime."
>
> 3. Whether the trial court's [o]rder granting summary judgment was issued in error as a result of the court's erroneous finding that [Victory] did not discharge Appellant in violation of public policy.

Appellant's Brief at 5.

For ease of disposition, we address Appellant's issues together.[4]  In doing so, we remain mindful of our standard of review for an order granting a motion for summary judgment:

> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.  Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.  Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Doman v. Atlas America, Inc.*, 150 A.3d 103, 105 (Pa. Super. 2016) (citation omitted).

With respect to wrongful termination, this Court has previously explained:

> "In Pennsylvania, absent a statutory or contractual provision to the contrary, either party may terminate an employment relationship for any or no reason." *Weaver v. Harpster*, … 975 A.2d 555, 562 ([Pa.] 2009).  "[A]s a general rule, there is no

---

[4] Appellant raises three issues in his statement of the questions involved, but does not divide the argument section of his brief into three corresponding parts, in contravention of Pa.R.A.P. 2119(a).  *See* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."); *Donaldson v. Davidson Bros., Inc.*, 144 A.3d 93, 99 n.9 (Pa. Super. 2016) (determining that the appellant failed to comply with Rule 2119(a) where the appellant's brief did not "present and develop eight arguments in support of the eight questions raised").  Notwithstanding, Appellant's noncompliance with Rule 2119(a) does not preclude our review.

common law cause of action against an employer for termination of an at-will employment relationship." *Id.* …

> An employee may bring a cause of action for a termination of that relationship only in the most limited circumstances, where the termination implicates a clear mandate of public policy. In our judicial system, the power of the courts to declare pronouncements of public policy is sharply restricted. Rather, it is for the legislature to formulate the public policies of the Commonwealth. The right of a court to declare what is or is not in accord with public policy exists only when a given policy is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it. Only in the clearest of cases may a court make public policy the basis of its decision. To determine the public policy of the Commonwealth, we examine the precedent within Pennsylvania, looking to our own Constitution, court decisions, and statutes promulgated by our legislature.

*Id.* at 563 (quotation and citations omitted).

Applying this standard, Pennsylvania courts have found actionable exceptions where the employee was terminated for filing a claim for worker's compensation benefits, **Shick v. Shirey**, … 716 A.2d 1231 ([Pa.] 1998); for filing a claim for unemployment benefits, **Highhouse v. Avery Transportation**, … 660 A.2d 1374 ([Pa. Super.] 1995); for failing to submit to a polygraph test where a statute prohibited employers from so requiring, **Kroen v. Bedway Security Agency, Inc.**, … 633 A.2d 628 ([Pa. Super.] 1993); for complying with a statutory duty to report violations to the Nuclear Regulatory Commission, **Field v. Philadelphia Electric Co.**, … 565 A.2d 1170 ([Pa. Super.] 1989); and for serving jury duty, **Reuther v. Fowler & Williams, Inc.**, … 386 A.2d 119 ([Pa. Super.] 1978).

Courts have found no public policy exception where the employee was terminated as a result of sexual discrimination by an employer not covered by the Pennsylvania Human Relations Act, **Weaver**, **supra**; for complaining about violations of the Occupational Safety and Health Act, **McLaughlin v. Gastrointestinal Specialists, Inc.**, … 750 A.2d 283 ([Pa.] 2000); for expressing concerns that the employer's product was unsafe, **Geary v. U.S. Steel Corporation**, … 319 A.2d 174 ([Pa.] 1974); for disengaging an illegal surveillance system, **Hineline v. Stroudsburg Electric**

> ***Supply Co.***, … 559 A.2d 566 ([Pa. Super.] 1989), *appeal denied* … 574 A.2d 70 ([Pa.] 1989); or for complaining about the waste of taxpayer money, ***Rossi v. Pennsylvania State University***, … 489 A.2d 828 ([Pa. Super.] 1985).
>
> In sum, "an employer (1) cannot require an employee to commit a crime, (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when [specifically] prohibited from doing so by statute." ***Donahue v. Federal Exp. Corp.***, 753 A.2d 238, 244 (Pa. Super. 2000) (quoting ***Spierling v. First Am. Home Health Servs., Inc.***, 737 A.2d 1250, 1252 (Pa. Super. 1999)). Outside of those categories of our legislature's expression of public policy, a court may find a public policy exception that will sustain a wrongful termination action only if the public policy "is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it." ***Weaver***, 975 A.2d at 563.

***Mikhail v. Pa. Org. for Women in Early Recovery***, 63 A.3d 313, 316-17 (Pa. Super. 2013).

Here, Appellant argues that "[t]he record demonstrates that [Victory's] accountant, Hindman, expressly instructed Appellant to submit actual physical inventory counts rather than calculated on-hand inventory figures. Further, Appellant testified that Corrigan and Dykstra instructed him to disregard Hindman's instruction and instead submit calculated on-hand inventory figures to Hindman." Appellant's Brief at 25-26. Appellant maintains that, had he followed Corrigan and Dykstra's instruction, "he would have provided fraudulent information to [Victory's] accountant[,] in that Hindman expected [him] to submit actual physical inventory counts as opposed to calculated on-hand inventory, thereby inflating the value (greater than $50,000) of [Victory's] non-alcoholic inventory." ***Id.*** at 26. Doing so, Appellant says,

would have violated 18 Pa.C.S. § 4104(a)-Tampering with records or identification, and 18 Pa.C.S. § 4107(a)(11)(i)–Deceptive or fraudulent business practices, which respectively provide the following:

**§ 4104 - Tampering with records or identification**

**(a) Writings.--**A person commits a misdemeanor of the first degree if, knowing that he has no privilege to do so, he falsifies, destroys, removes or conceals any writing or record, or distinguishing mark or brand or other identification with intent to deceive or injure anyone or to conceal any wrongdoing.

**§ 4107. Deceptive or fraudulent business practices**

**(a) Offense defined.--**A person commits an offense if, in the course of business, the person:

(11) does either of the following when the person is in a client relationship with a certified public accountant, public accountant or public accounting firm:

(i) provides false or misleading information to the certified public accountant, public accountant or public accounting firm in connection with performance of an attestation function for the client which results in an attestation by the certified public accountant, public accountant or public accounting firm of a materially misleading financial statement, audit, review or other document….

18 Pa.C.S. § 4104(a); 18 Pa.C.S. § 4107(a)(11)(i); ***see also*** Appellant's Brief at 24-25.  Appellant argues that, because he refused to commit such crimes, Victory terminated him.  Appellant's Brief at 27.

No relief is due.  Despite viewing the record in the light most favorable to Appellant, he has failed to demonstrate that Victory required him to commit a crime.  As the trial court discerned, Appellant "was simply required by Victory to use a particular accounting method to record inventory."  TCO at 8.

Though the instructions of Corrigan and Dykstra differed from those of Hindman, Appellant offers no explanation as to why he could not have informed Hindman at the time that he would no longer be submitting actual physical inventory counts to him, but instead would provide calculated on-hand inventory counts per Corrigan and Dykstra's instructions.[5] Such communication would have seemingly resolved any concerns Appellant had about possibly misleading Hindman and falsifying records. Thus, viewing the record in the light most favorable to Appellant, the evidence does not support that Victory required Appellant to commit a crime by providing false and misleading information to Hindman.

Moreover, Appellant does not suggest that a calculated on-hand inventory count is, in itself, an unlawful or otherwise prohibited accounting method.[6] Rather, it appears that Appellant had a difference in opinion with

_____

[5] Appellant testified at his deposition that he verbally reported to Hindman that he had been asked to give Hindman "inaccurate numbers," but did not remember when he did so, or if it was before or after he was terminated. *See* Exhibit C to Victory's Motion for Summary Judgment, 1/10/19, at 182. Appellant also testified that he did not report it to anyone in Human Resources as of early October of 2015. *Id.* at 182-83.

[6] Victory correctly notes that Appellant "does not actually claim that Victory's choice of accounting method violated any applicable accounting standard, or that Victory ever prepared financial records or statements without disclosing the method used for recording inventory." Victory's Brief at 34. *See also id.* at 36-37 ("[Appellant] admitted at his deposition that he could not show that the monthly September valuation for [point of sale] inventory ever made its way onto any type of financial statement, or point to any specific financial statement or loan application by Victory that was purportedly falsified, much less sent to lenders or other third parties. [Appellant] also never alleged that

Corrigan and Dykstra about how inventory should be counted. This Court has previously stated that:

> An employee who is also a professional has a dual obligation: to abide by federal and state laws, in addition to staying within the bounds of his/her professional code of ethics. Such responsibility may necessitate that the professional forego the performance of an act required by his/her employer. ***However, when the act to be performed turns upon a question of judgment, as to its legality or ethical nature, the employer should not be precluded from conducting its business where the professional's opinion is open to question.***

***McGonagle v. Union Fidelity Corp.***, 556 A.2d 878, 885 (Pa. Super. 1989) (emphasis added; internal citations omitted). ***See also, e.g.***, ***Clark v. Modern Group Ltd.***, 9 F.3d 321, 323 (3d Cir. 1993) (rejecting the employee's claim that "Pennsylvania's public policy exception to the at-will doctrine extends to cases in which an employee 'reasonably believes' that his employer has requested him to perform an unlawful act and is discharged for objecting to the proposal be believes is unlawful");[7] ***Mikhail***, 63 A.3d at 321 ("[W]e cannot conclude that [the appellee's] decision to terminate [the appellant] based upon differences in judgment violates the public policy of this Commonwealth."); ***Riggio v. Burns***, 711 A.2d 497, 502 (Pa. Super. 1998)

---

such purportedly 'falsified' (and nonexistent) financial statements ever actually induced any specific third party to commit to a financial investment, or that any third party ever relied upon an estimated calculation of inventory to his or her detriment.") (footnote omitted).

[7] The trial court relied on ***Clark*** in its opinion. We acknowledge that "[w]e are not bound by decisions of the federal courts, but we may rely on them for persuasive authority." ***See, e.g.***, ***McEwing v. Lititz Mut. Ins. Co.***, 77 A.3d 639, 648 n.7 (Pa. Super. 2013).

(rejecting the appellant's claim that her termination violated the Pennsylvania Whistleblower Law at summary judgment stage where it "appear[ed] that the question of what constituted proper supervision involved a difference of medical opinion"); *Nix v. Temple University of Com. Sys. of Higher Educ.*, 596 A.2d 1132, 1136 (Pa. Super. 1991) (determining that the appellant's termination due to her refusal to approve acts that she believed would be unlawful did not violate public policy because "merely alleging an illegality or an attempt to avoid it is not a violation of a clearly defined mandate of public policy") (citation omitted); *Rossi v. Pennsylvania State University*, 489 A.2d 828, 836 (Pa. Super. 1985) (concluding that the trial court properly granted summary judgment to the appellees on a wrongful discharge claim brought by an employee, and recognizing "the unwise effect of transferring to the judicial forum the duty of evaluating the propriety of management decisions"). Accordingly, we agree with Victory's claim that "[i]t is merely [Appellant's] conclusory assertion that reporting inventory as directed would constitute 'falsification' of inventory records. [Appellant's] mere belief that the activity was illegal or disagreement with Victory's accounting methods, are [*sic*] insufficient to establish a public policy violation under Pennsylvania law[,] which requires an actual crime." Victory's Brief at 26.[8]

---

[8] Appellant argues that "[w]hether … [Victory's] directive to Appellant to submit to [Victory's] accountant calculated on-hand inventory counts instead of actual physical counts — in direct contravention of the accountant's explicit directive — constituted a crime is an issue of fact and therefore a question for

Finally, we take into account the narrowness of any public policy exception to at-will employment. As the trial court observed, "[t]he public policy exception is not meant to usurp a private business'[s] operations, nor interfere with management prerogatives. The public policy exception is not intended to protect employees who question internal business practices that are not criminal acts." TCO at 8. Indeed, our Supreme Court has noted that its jurisprudence "demonstrate[s] that the strong presumption of all non-contractual employment relations is at-will. An employee may bring a cause of action for a termination of that relationship only in the most limited circumstances, where the termination implicates a clear mandate of public policy." ***Weaver v. Harpster***, 975 A.2d 555, 563 (Pa. 2009). ***See also id.*** ("These cases demonstrate Pennsylvania's traditional view that exceptions to at-will employment should be few and carefully sculpted so as not to erode an employer's inherent right to operate its business as it chooses."). As Appellant has not shown that Victory required him to commit a crime, or that some other public policy exception should apply, we conclude that the trial court properly entered summary judgment in favor of Victory.

_____

the jury." Appellant's Brief at 18. However, even in viewing all of the evidence in the light most favorable to him, Appellant has not established, among other things, that such a valuation method is illegal or improper, or that he was precluded in some way by Corrigan and Dykstra from informing Hindman of the change in counting inventory. Consequently, as a matter of law, we are able to conclude that Corrigan and Dykstra's directive does not constitute a crime. ***Accord*** Victory's Brief at 51 ("In finding that [Appellant's] case has no merit, the [trial] court fully credited [Appellant's] version of the events and submitted documents and testimony, but found that he failed to show that he was directed by Victory to commit a criminal act.") (citation omitted).

Order affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 7/8/2020*